IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

**JEFFREY JUDKINS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lawrence County**
**No. 36633    Christopher V. Sockwell, Judge**

_____

**No. M2023-00296-CCA-R3-PC**
_____

Petitioner, Jeffrey Allen Judkins, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in finding that he received the effective assistance of counsel at trial. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

John M. Schweri, Columbia, Tennessee, for the appellant, Jeffrey Allen Judkins.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Christi Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

*Trial*

On the evening of October 18, 2016, Melody Denton was working alone at the Fall River Market in Lawrenceburg when a man, later identified as Petitioner, entered the store after dark with a "sawed off" shotgun and wearing a ski mask, gloves, and a dark-colored "hoodie." He pointed the gun at her and demanded that she give him the "big bag" of

money located behind the store counter. *State v. Judkins*, No. M2018-00704-CCA-R3-CD, 2019 WL 3889733, at \*1 (Tenn. Crim. App. Aug. 19, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020). Ms. Denton initially believed that she was being pranked, but Petitioner responded by "jabbing" the gun at her, stating that he had the gun cocked, and demanding she give the money bag to him. *Id.* Ms. Denton then gave Petitioner the bag containing several checks and approximately $300 in cash. *Id.* He grabbed the bag and ran out of the store, and Ms. Denton pressed the "panic button" to alert law enforcement. *Id.* She saw a white Nissan Frontier exiting the store parking lot with Petitioner chasing after it. *Id.* Ms. Denton then locked the store's front door. *Id.* Ms. Denton described Petitioner as "scrawny" and said that he was taller than she, and she was five feet, four inches tall. *Id.* She was confident that a man and not a woman committed the robbery. *Id.*

Jeffrey Smith, who lived directly behind the Fall River Market, had just arrived home with his family on the evening of October 18 when he saw a small white truck with "a camper shell" covering the bed that appeared to be pulling into the driveway behind him. *Id.* However, the truck's driver eventually parked behind the store and turned off the headlights leaving the parking lights illuminated. *Id.* Mr. Smith observed that the front passenger side parking light on the truck was not working. *Id.* He "found the situation odd" and remained outside to observe. *Id.* Mr. Smith saw an individual who he estimated to be approximately five-feet-eight or nine inches tall and weighing 140 pounds, exit the passenger side of the truck, slam the door, and walk toward the front of the store. *Id.* The truck's driver then left the store and pulled back out on to Fall River Road. *Id.* at \*2. The individual emerged from the store, and Mr. Smith shined his flashlight and yelled at the individual, "asking 'what the F he was doing over there.'" *Id.* Mr. Smith saw the individual, who was carrying something in his hands, run after the truck. *Id.* Mr. Smith said that it was dark outside at the time, and the individual was wearing a dark-colored hoodie with a mask or toboggan covering the individual's face, so he was unable to see any facial features. *Id.* Mr. Smith walked to the store to see if help was needed. *Id.* He spoke with Ms. Denton who appeared "fairly upset and rattled." *Id.* (quotations omitted).

The Fall River Market's bank bag was found by Vergie Nix on the side of Crowder Road one day after the robbery. *Id.* Ms. Nix had heard about the robbery and returned the bag to the store. *Id.*

Co-defendant, Ricky Alexander, testified that in October 2016, he lived in an apartment on Manor Drive in Lawrenceburg and drove a white Nissan Frontier with a camper shell on it. *Id.* He and Petitioner had grown up together, and Petitioner was staying with him at the time because Petitioner had no other place to live. *Id.* He had also gotten Petitioner a job with his long-time employer, Buckshot Brannon. *Id.* Co-defendant Alexander testified that on October 18, 2016, Petitioner said he wanted to rob the Fall River Market because he had seen a large bag of money behind the counter a few days earlier. *Id.* Petitioner also brought a sawed-off shotgun into the apartment that same evening. *Id.* According to Co-defendant Alexander, Petitioner had been talking "off and on" for a few

days about robbing other places because "he was wanting some money real bad." *Id.* Co-defendant Alexander asserted that although he tried to dissuade Petitioner from robbing the Fall River Market, he agreed to drive Petitioner there to look at it. *Id.* Upon arrival, Co-defendant Alexander pulled his truck in behind the store and turned the headlights off. *Id.* He said that Petitioner quickly exited the vehicle and went inside the store. *Id.* Co-defendant Alexander was not prepared for Petitioner to actually go inside the store, so Co-defendant Alexander "backed out from where he was parked, pulled into the parking lot, and started to drive towards town." *Id.* He then saw Petitioner come out of the store and start running after him in the truck. *Id.*

Co-defendant Alexander testified that he saw a man standing in front of the house located behind the store and that the man yelled "what are ya'll doing." *Id.* Co-defendant Alexander turned his truck around and picked up Petitioner at "a mechanic place where they worked on big trucks and stuff." *Id.* As they drove back past the Fall River Market, Co-defendant Alexander saw Ms. Denton standing outside talking to the man from the house located behind the store. *Id.*

Co-defendant Alexander testified that he and Petitioner "almost c[a]me to blows" as they drove away from the store because of what Petitioner had done. *Id.* He said that Petitioner began throwing items out of the vehicle, including the money bag and the ski-mask Petitioner had been wearing. *Id.* Co-defendant Alexander said that none of the items belonged to him but acknowledged that he wore a hat, gloves, and a sweatshirt for work that he had left in his truck. *Id.* Co-defendant Alexander received $100 in cash from Petitioner after the robbery. *Id.* He admitted that he and Petitioner, knowing that police would be looking for them and the truck, removed the camper shell and placed it in the pasture on Mr. Brannon's property without Mr. Brannon's knowledge. *Id.* Co-defendant Alexander testified that Petitioner left the day after the robbery, and he was unable to contact Petitioner by phone. *Id.*

Detective Zach Ferguson of the Lawrence County Sheriff's Office investigated the robbery. *Id.* at *3. He went to the scene, spoke with witnesses, and obtained video footage from HLH Express, a trucking company located near the market on Crowder Road. *Id.* Detective Ferguson reviewed the video footage with the trucking company's owner, David Goolsby. The video showed a white Nissan Frontier with a camper shell stop in front of the business at approximately 7:45 p.m. "Mr. Goolsby described that, in the video, the truck pulled towards some pine trees, that someone came [in] 'from the left' and got into the truck, and that the truck then made 'an abrupt U-turn and sp[u]n out.'" *Id.* Detective Ferguson ultimately identified Co-defendant Alexander's truck from the video footage. *Id.* However, the individuals in the truck were not identifiable from the video. *Id.*

Police spoke with Co-defendant Alexander on October 28, 2016, and he consented to a search of his truck. *Id.* Detective Ferguson noted that the truck's parking light did not work, and the truck bed appeared to have had a camper shell that had been removed. *Id.*

- 3 -

Co-defendant Alexander initially lied and told police that he had no knowledge of the robbery. *Id.* He claimed that his daughter had recently borrowed the vehicle, got into an accident and left the scene. *Id.* However, Co-defendant Alexander admitted his role in the robbery after police began questioning his daughter who was incarcerated. *Id.* Co-defendant Alexander gave a written statement on November 2, 2016. *Id.*

Co-defendant Alexander told Detective Ferguson that he and Petitioner hid the camper shell on Mr. Brannon's property, and Detective Ferguson visited the property and found it. *Id.* Detective Ferguson noted that the camper shell had not been there long "because the grass underneath it was relatively undisturbed." *Id.* Co-defendant Alexander also told Detective Ferguson where Petitioner discarded items along the roadside as they left the store after the robbery. *Id.* On November 2, 2016, Detective Ferguson located a black ski mask, a black glove, and a dark-colored hoodie in a ditch on Skyline Drive. *Id.* Later analysis of the items revealed that Petitioner was the primary contributor of DNA found on the ski mask and glove. *Id.* The DNA of a "minor contributor" was also found, but there was insufficient DNA to identify that person. *Id.* The shotgun used during the robbery was never recovered. *Id.*

Co-defendant Alexander denied that his daughter was with him the night of the robbery and said that he decided to tell the truth because he and Petitioner were "guilty as sin." *Id.* He also confirmed that "he had an extensive criminal record beginning when he was a juvenile, including being convicted of armed robbery in 1978." *Id.* Co-defendant Alexander had three additional convictions "from the 1970s to the 1990s." *Id.* He also pled guilty to a vehicle theft "around 2010." *Id.* Co-defendant Alexander testified that he was approximately five feet, ten inches tall. *Id.* He further explained, "I know when I had my back surgery, it seemed like I drawed up [sic] and I shriveled up to almost nothing. I don't even know if I'm 5'10 anymore. I may not even be 5'9. I'm not really sure." *Id.* He said that he weighed 146 pounds at a recent doctor's visit. *Id.* Co-defendant Alexander testified that he likely "changed [his] appearance" after the robbery, for example, by trimming his beard. *Id.*

Co-defendant Alexander acknowledged that he was later indicted along with Petitioner for the robbery of the Fall River Market. *Id.* at *4. He was not arrested until after he was indicted in March 2017, approximately five months after the robbery occurred. *Id.* Co-defendant Alexander testified that he was not promised anything in exchange for his testimony against Petitioner. *Id.*

Petitioner was convicted of aggravated robbery and received a twenty-two-year sentence to be served in confinement. *Id.* On direct appeal, this court affirmed Petitioner's conviction. *Id.* at *7.

On December 28, 2020, Petitioner filed a *pro se* petition for post-conviction relief alleging that the trial court improperly denied his motion for new trial because the State

failed to disclose "favorable information-evidence" in violation of *Brady v. Maryland*; that the trial court erred by "limiting defense's cross-examination of responding officer regarding statements made to him by the alleged victim, where those statements were inconsistent with the victim's written statement to police and ultimately his trial testimony"; and numerous grounds of ineffective assistance of counsel.[1] Counsel was appointed, but the record on appeal does not contain an amended petition for post-conviction relief.

*Post-Conviction Hearing*

Trial counsel testified that he had been practicing law for twenty-five years and had handled more than 500 and "maybe more" than 1,000 criminal cases. He had been appointed to represent Petitioner in general sessions court. Petitioner was in custody at the time and was held without bond because he was on either state probation or community corrections at the time of the offenses in this case. Trial counsel had previously represented Petitioner in other matters, and they "had a good talking relationship."

Trial counsel estimated that he met with Petitioner in this case approximately five times before trial. He "would have" obtained a recording of the preliminary hearing but did not recall if he played the recording for Petitioner. Trial counsel did not recall talking to Mr. Smith before trial but remembered that Mr. Smith believed a woman had been involved in the robbery because the person who got out of the truck was about the same size as Mr. Smith's wife. Trial counsel assumed that the person Mr. Smith described was Petitioner.

Trial counsel agreed that Co-defendant Alexander originally told police that he did not have anything to do with the robbery. When the police confronted him with evidence that his truck may have been seen at the time of the robbery, he said that he loaned the truck to his daughter. However, when police began focusing on Co-defendant Alexander's daughter, he wanted to "come clean and tell the truth." He also admitted to changing his appearance and that of the truck. Trial counsel agreed that Co-defendant Alexander was the only person who identified Petitioner. He further agreed that Co-defendant Alexander told police about the black ski mask, black glove, and the Fall River Market bank bag which contained checks, being thrown out of the truck window after the robbery. Trial counsel noted that there was "other corroborating circumstantial evidence which tended to incriminate [Petitioner]."

Trial counsel was aware through discovery that Co-defendant Alexander was going to testify at trial. He cross-examined Co-defendant Alexander concerning his prior convictions, including armed robbery. Trial counsel did not recall if he obtained certified copies of the prior convictions, but at trial, Co-defendant Alexander admitted the armed

---

[1] We will address only those issues raised on appeal.

- 5 -

robbery conviction and "possibly other convictions." When asked if having the certified copies of Co-defendant Alexander's convictions would have helped "cast a doubt" on Petitioner's involvement in the robbery, trial counsel replied: "It would have impeached him. Like I said, I impeached him through his own admission. So I guess the question is would it have impeached him more, made it more apparent to the jury. I mean possibly." However, trial counsel asserted that Co-defendant Alexander's convictions "were in evidence already" through Co-defendant Alexander's own testimony.

Trial counsel agreed that DNA was a key piece of evidence produced by the State. He did not recall if the Tennessee Bureau of Investigation ("TBI") laboratory report concerning the DNA evidence was admitted as an exhibit at trial. However, he knew that the black glove and ski mask were entered "[b]ecause they brought that into court and it was in a bag, and they put plastic gloves on, or vinyl gloves, to retrieve those items." Trial counsel agreed that the TBI report should have been entered as an exhibit,[2] but the TBI forensic scientist could testify "about that work he did[.]" He noted that he did not receive the report in initial discovery but received it sometime later. Post-conviction counsel pointed out that although Detective Ferguson's initials indicated that he sealed the evidence bag containing the commingled items consisting of the black glove, ski mask, and DNA swabs sent to the TBI for DNA testing, it was actually sealed by Detective Jackie Heard. However, trial counsel testified that he did not remember having a "serious concern about the chain of custody."

Trial counsel testified that Petitioner's DNA profile was found on the black glove and ski mask that were sent to the TBI, and there was one additional unknown profile. The DNA profiles were submitted to the state Combined DNA Index System ("CODIS") database for comparison, but he did not request that the profiles be compared to the national CODIS database or any additional "larger, more global" databases. The TBI lab report noted that the "partial DNA profile is not eligible for addition to the national database." Additionally, trial counsel did not ask for Co-defendant Alexander or his daughter to provide a DNA sample for testing. He agreed that it may have been "appropriate" to obtain the samples based on any inconsistencies in Co-defendant Alexander's testimony, but he did not know for certain. Trial counsel testified:

> You're looking at what a jury is going to think. Let's say it was [Co-defendant] Alexander's DNA, we found out that it was his, I mean, I don't know - - I kind of assumed it was [Co-defendant] Alexander's because [Co-defendant] Alexander testified that he kept those kind of items in and around his truck for work: gloves, hats, things like that.

---

[2] The record from the direct appeal shows that the report was in fact entered as Exhibit #6 at trial. *See Harris v. State*, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records).

- 6 -

But he couldn't - - if I remember right, he couldn't - - he didn't know whether those were gloves or a cap that had belonged to him, and - - but he testified that [Petitioner] definitely had them on the night in question and that he threw them out the window[.]

On cross-examination, trial counsel acknowledged that Co-defendant Alexander could have "theoretically" given a DNA sample as a result of his prior felony convictions that would have been included in the CODIS database.

Trial counsel acknowledged that Petitioner had been living with Co-defendant Alexander and that Co-defendant Alexander had access to the items, and his DNA or his daughter's DNA could have been on them. Trial counsel further agreed this would have "lined up" with Mr. Smith's testimony that he originally thought that he saw a man and a woman arguing outside of the store and that it could have been Co-defendant Alexander and his daughter who committed the robbery. However, trial counsel testified: "I mean, there are some problems with that, I mean, in that the store clerk testified that it was definitely a male subject that robbed her" because trial counsel recalled "pressing her on that. But she was confident that it was a male who came in the store." Trial counsel acknowledged that there was a discrepancy as to what color hoodie the robbery suspect was wearing. He noted that one witness testified that the hoodie was white, but the one that was recovered was dark-colored. Co-defendant Alexander told police where to find the items that were recovered after the robbery.

When asked how he prepared for Petitioner's case, trial counsel testified that he requested and received discovery and then reviewed it with Petitioner and "gave him a copy of the paper discovery for him to have in his jail cell." He also reviewed the surveillance video of the white truck, visited the Fall River Market to inspect the crime scene, and spoke with Ms. Denton and two of the officers involved in the case. Trial counsel thought that he spoke to Co-defendant Alexander without his attorney present because there were no charges pending against him at the time, but he could not recall for certain. He also drove around the area of the robbery so that he would be "familiar with the road and the layout of the curves, the hills, the houses along the way and stuff," and from the road he "inspected the trucking company where the video footage was shot." Trial counsel further testified that in preparation for a trial, he typically prints out the indictment and relevant statutes, reviews the rules of evidence at issue, and obtains a copy of the jury pool, which he also provides to a defendant to see if they know anyone on the list. Trial counsel testified that the defense strategy was to attack Co-defendant Alexander's credibility and argue that Co-defendant Alexander committed the robbery and was using Petitioner as a "scapegoat."

Trial counsel testified that Petitioner did not wish to testify at trial because he had an extensive criminal record that could be used to impeach his testimony. He noted that Petitioner had "ten separate dates that he received felony convictions, but some of them

were multiple felonies." Therefore, Petitioner was either a persistent or a career offender. Trial counsel said that Petitioner did not provide him with any names for an alibi witness. Trial counsel testified that his standard practice is to inform his clients that it is their sole decision to testify, and a *Momon*[3] hearing was conducted in this case.

Trial counsel did not recall if the judge commented at the preliminary hearing that Co-defendant Alexander's story did not match the other testimony presented. Trial counsel said that he reviewed the hearing prior to trial, but did not remember the comment because he may have skipped over it because the court's comments would not have been "particularly important" to him as a defense attorney, and it "wouldn't have influenced [him] one way or the other." He said: "So, from a defense standpoint, I would be listening to that preliminary hearing to hear what the witnesses were going to testify to - - [ ]so that I can be ready to cross-examine them, or to examine them if they're my witnesses in court." Generally, he would take notes of what the witnesses said at the hearing to compare it with their trial testimony.

Petitioner testified that he requested that trial counsel provide him with a transcript of the preliminary hearing, but Petitioner never received it. He said that the trial court commented that Co-defendant Alexander's testimony at the preliminary hearing did not match. Petitioner wanted to show that Co-defendant Alexander had "changed his story two or three times during the preliminary [hearing]. At trial his story was different from the preliminary [hearing]." Petitioner agreed that the hoodie found by police on Skyline Drive belonged to him and that it had been in Co-defendant Alexander's truck because they worked together. He also noted that he wore gloves and a ski mask or toboggan at work because it was cold at the time. He said that it was possible that at some point, he had worn the black ski mask recovered in this case. Petitioner agreed that one witness said that the hoodie that the suspect wore at the time of the robbery was white, and another witness said that it was a dark color.

Petitioner did not deny that his DNA was on the black glove and black ski mask sent to the TBI; however, he complained that the items were commingled in the same evidence bag with the DNA swabs taken from him by Captain Adam Brewer of the Lawrence County Sheriff's Office ten months after the robbery occurred. He also wrote to the "TBI lab" to ask how they had received the items in the evidence bag. Petitioner pointed out that the TBI scientist testified that there was a second person's DNA on the items, and the jury asked if "anybody else was tested for DNA." Petitioner claimed that prior to trial, he never saw the TBI lab report concerning the DNA results even though he had requested it from trial counsel. He said that he first saw the report at the post-conviction hearing and noted that it was not made an exhibit at trial. He noted that the TBI scientist compared Petitioner's DNA "to the in-house database or something like that[,]"

---

[3] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999) (establishing the standard of knowledge a defendant must demonstrate to waive their constitutional right to testify).

and "he had no hits" until he compared it to Petitioner's DNA sample that was taken by Captain Brewer at the county jail. Petitioner testified that he was on community corrections at the time of the offenses in this case, and had been on community corrections since 1995. He had previously provided a DNA sample when he was originally placed on community corrections. He asked trial counsel why the DNA of Co-defendant Alexander and his daughter had not been tested because Co-defendant Alexander had originally said that his daughter had the truck on the night of the robbery.

Petitioner testified that he wrote trial counsel numerous letters from the jail and prison but Petitioner did not keep copies of them. When asked if there were any witnesses that he wanted trial counsel to talk with, Petitioner only shrugged his shoulders. He said that he and trial counsel discussed his decision about testifying on the day of trial. Petitioner testified:

> Well, it was just, you know, he said that the State was going to try to impeach me, you know, and since I had prior felonies, which was another thing - - he sat here and said I had ten felonies i[n] just one case, one charge.

> Burglary, theft, and vandalism is all one charge but they've got three different cases for it and made it three different felonies, Your Honor.

Petitioner asserted that all of the charges stemmed from "one incident" with the same offense date. He agreed that his prior criminal record was the reason that he did not testify at trial, and he was told that he was a career offender. Petitioner admitted he was advised that it was his sole decision about whether to testify.

On cross-examination, Petitioner agreed that trial counsel had Co-defendant Alexander's prior statements and "probably" cross-examined him about any discrepancies at trial. He further agreed that the hoodie found after the robbery belonged to him, and it was packaged separately from the glove, ski mask, and DNA samples, and sent to the TBI for testing. Petitioner acknowledged that the glove and ski mask could have possibly been his and contained his DNA. However, he asserted that the items were found ten miles from the crime scene and could have been placed there by Co-defendant Alexander. Petitioner was unable to say how he was prejudiced by having the glove, ski mask, and DNA samples commingled in the same envelope or how the items were contaminated.

**Analysis**

In his brief, Petitioner sets out four issues on appeal claiming that trial counsel was ineffective by 1) failing to conduct a prompt and adequate pre-trial investigation; 2) failing to adequately prepare for trial and present a defense; 3) failing to request that DNA of other potential suspects found during the investigation be submitted to CODIS for potential matches to exonerate or exculpate Petitioner; and 4) that the cumulative effect of the errors

entitles him to relief. Under each subheading, Petitioner raises multiple issues, some of which are duplicated. We have identified eight issues of ineffective counsel raised and will address them accordingly: trial counsel 1) failed to review with Petitioner the court's comments at the preliminary hearing concerning Co-defendant Alexander's inconsistent statements; 2) failed to have the partial DNA profile of a second unknown individual submitted to a "larger database to attempt to identify whose DNA it was" and have the DNA of other suspects tested; 3) failed to challenge the chain of custody of the DNA evidence "when one officer packaged it and another one signed for it"; 4) failed to discuss until the day of trial whether Petitioner would testify; 5) failed to meet with Petitioner a sufficient number of times by meeting with him only five times before trial; 6) failed to interview Mr. Smith and Ms. Denton before trial to find out what their testimony would be; 7) failed to submit certified copies of Co-defendant Alexander's prior convictions for impeachment purposes; and 8) that cumulative error entitles him to relief. The State responds that Petitioner has waived five of his claims, that he has not demonstrated that trial counsel rendered deficient performance as to any of his claims, including those that are waived, and that he has not shown any prejudice.

## I. Waiver

Initially, we point out that Petitioner did not make any closing arguments at the post-conviction hearing concerning his claims of ineffective assistance of counsel. Instead, as reflected in the record, Petitioner requested to submit his arguments in a "letter" to the post-conviction court. The court approved that process and gave the State ten days to respond to the arguments set out in the letter. Neither Petitioner's letter nor the State's response is included in the record on appeal. "It is the burden of the appellant to prepare a record on appeal that presents a complete and accurate account of what transpired in the trial court with respect to the issue on appeal." *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997) (citing Tenn. R. App. P. 24 (b)). Thus, we do not know what issues Petitioner argued in support of his post-conviction petition.

Additionally, although post-conviction counsel asserted at the post-conviction hearing that he amended Petitioner's original petition "with the court[,]" the record on appeal does not contain an amended post-conviction petition. The post-conviction court's order denying relief also noted that there was an amended petition. However, in its response to the post-conviction petition, the State noted that "the State has not been made aware of any amended petition being filed [by] [Petitioner's] attorney, . . . . The State responds to [Petitioner's] original petition[.]" Because there is no amended petition in the record, the only way this court may respond to any issues not formally raised in the original post-conviction petition is "if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). Otherwise, the issue is waived. *Id.* at 457; *see also* Tenn. R. App. P. 36(a) (issues raised for the first time on appeal are waived).

- 10 -

We agree with the State that Petitioner has waived the following claims: that trial counsel failed to discuss until the day of trial whether Petitioner would testify; failed to meet with Petitioner a sufficient number of times by meeting with him only five times before trial; and failed to interview Mr. Smith and Ms. Denton before trial to find out what their testimony would be. These specific claims were not raised in the original post-conviction petition or addressed in the post-conviction court's order denying post-conviction relief. It is not known whether these issues were argued in the "letter" to the post-conviction court because as previously stated, the letter was not included in the record on appeal. Therefore, the claims are waived. *See Holland*, 610 S.W.3d at 458. Waiver notwithstanding, there was limited testimony presented at the post-conviction hearing concerning these claims, and they would fail on the merits because under a de novo review, Petitioner has not shown that trial counsel's performance was deficient or prejudicial. Petitioner is not entitled to relief on those issues.

Petitioner further contends on appeal that the cumulative effect of trial counsel's errors deprived him of a fair trial and that he should be granted a new trial. However, we agree with the State that this issue is likewise waived because it was not raised in the original post-conviction petition, nor was it addressed at the post-conviction hearing or in the post-conviction court's order denying relief. *See id.* In any event, we conclude there were no errors committed by trial counsel, and as a result, no cumulative error exists. Petitioner is not entitled to relief on this basis.

## II. Ineffective Assistance of Counsel

The right to the effective assistance of counsel is safeguarded by both the Constitution of the United States and the Constitution of Tennessee; therefore, it is cognizable under the Post-Conviction Relief Act. U.S. Const. amend VI; Tenn. Const. art. I, § 9; T.C.A. § 40-30-103 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."). A petitioner alleging the ineffective assistance of counsel "shall have the burden of proving the allegations of fact by clear and convincing evidence." T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009). Whether a petitioner asserts ineffective assistance of trial or appellate counsel, he bears the burden of showing that (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990). Failure to satisfy either prong is sufficient to deny relief. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004); *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) ("[I]f this Court determines that either prong is not met, we may forego consideration of the other prong.").

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008) (citing *Finch*, 226 S.W.3d at 315). Thus, an appellate court is bound by the factual findings of the post-conviction court unless

the evidence in the record preponderates against those findings; but the post-conviction court's application of law to those factual findings is reviewed de novo with no presumption of correctness. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (citing *Dellinger*, 279 S.W.3d at 293); *State v. Fields*, 40 S.W.3d 450,457-58 (Tenn. 2001)).

### A. Failure to Review the Court's Comments from the Preliminary Hearing

Petitioner contends that trial counsel rendered deficient performance because he did not "personally listen to and review the [p]reliminary [h]earing with [Petitioner] which would have fostered an understanding of [Petitioner's] theory and validated it by hearing the Judge['s] comment on the record that [Co-defendant] Alexander wasn't being truthful at the [p]reliminary hearing." The State argues that this issue is waived because it was not raised in the original post-conviction petition, argued to the post-conviction court, or addressed by the post-conviction court.[4] We conclude that although not addressed by the post-conviction court, this issue was sufficiently raised for our consideration in the *pro se* post-conviction petition and during the post-conviction hearing.[5]

Concerning this claim, trial counsel did not recall if the judge at the preliminary hearing commented that Co-defendant Alexander's testimony did not match the other testimony presented at the hearing. Trial counsel testified that he reviewed the preliminary hearing prior to trial, but he may have skipped the comment because the judge's comments would not have been "particularly important" to him as a defense attorney, and it "wouldn't have influenced [him] one way or the other." Trial counsel further asserted that "from a defense standpoint, I would be listening to that preliminary hearing to hear what the witnesses were going to testify to - - . . . so that I can be ready to cross-examine them, or to examine them if they're my witnesses in court." He said that he generally took notes of the witnesses' testimony at the hearing to compare it with their trial testimony.

Petitioner has failed to include a transcript or recording of the preliminary hearing in the record, either on direct appeal or in his post-conviction proceeding. We cannot discern what comments were made by the preliminary hearing judge or whether they would have affected Petitioner's case. Therefore, Petitioner has failed to establish his factual allegations concerning this claim by clear and convincing evidence. Likewise, he cannot demonstrate any prejudice by trial counsel's alleged deficient performance. Petitioner is not entitled to relief on this issue.

---

[4] The only comment considered by the post-conviction court was one allegedly made by the trial court that there was doubt that Petitioner was involved in the robbery. The post-conviction court found that this comment was made at trial "during a jury-out conference regarding jury charges and lesser-included offenses." The post-conviction court did not address comments made by the judge at the preliminary hearing.

[5] The post-conviction petition incorrectly refers to the recording of the Grand Jury testimony rather than the preliminary hearing testimony.

- 12 -

### B. Failure to Have the Partial DNA Submitted to a Larger Database and Test the DNA of Other Suspects

Petitioner contends that trial counsel rendered deficient performance by failing to request that the partial DNA profile from an unknown individual, obtained from the black glove sent to the TBI laboratory, be submitted to a larger DNA database such as the national FBI CODIS database rather than the state CODIS database administered by the TBI. Petitioner further asserts that trial counsel should have requested that both Co-defendant Alexander and Co-defendant Alexander's daughter submit to DNA testing. Petitioner claims that running a "larger global search" on the unknown partial DNA profile "could have identified the other profile as [Co-defendant] Alexander's daughter which would have exonerated [Petitioner] and also matched the story of Jeff Smith, the only other witness to the incident who thought it was a man and woman who were arguing outside before the robbery took place."

Concerning this claim, the post-conviction court found:

Petitioner also claims that [trial counsel] did not request DNA samples to be run through the FBI CODIS data base and/or a larger national base to identify unknown profiles. The TBI testified at trial that the secondary sample obtained was inconclusive to produce a profile for further submission. Further, as argued by the prosecution in its reply, the Petitioner's DNA was the primary contributor, and the Petitioner claimed the items as his. Thus, this argument is without merit.

The record does not preponderate against the post-conviction court's findings. Trial counsel acknowledged at the post-conviction hearing that while it might have been "appropriate" to obtain Co-defendant Alexander's or Co-defendant Alexander's daughter's DNA sample, he did not know for certain. He further testified that he "kind of assumed" the partial DNA profile found on the black glove and ski mask was that of Co-defendant Alexander because he testified at trial that he "kept those kind of items in and around his truck for work[.]" Trial counsel further acknowledged that because Petitioner had been living with Co-defendant Alexander at the time of the robbery, the DNA of Co-defendant Alexander or his daughter could have been on those items. He agreed that this theory would have "lined up" with Mr. Smith's testimony that he originally thought that he saw a man and a woman arguing outside the Fall River Market and that it could have been Co-defendant Alexander or Co-defendant Alexander's daughter who committed the robbery. However, trial counsel testified: "I mean, there are some problems with that, I mean, in that the store clerk testified that it was definitely a male subject that robbed her" because trial counsel recalled "pressing her on that. But she was confident that it was a male who came in the store."

Moreover, the TBI forensic scientist who testified at trial said that he was unable to determine the identity of the minor DNA contributor to the partial profile and that his "interpretation" of the minor contributor was "deemed to be inconclusive." Therefore, he could not determine how many contributors there were to the sample, and he could neither include nor exclude anyone from being the minor contributor.

In considering whether the second DNA profile found on the black glove should have been submitted for testing again, the post-conviction court noted that "the second profile found on the glove was inconclusive and that no viable sample could be obtained from which to make any comparison." Even if the TBI forensic scientist had been given Co-defendant Alexander's or Co-defendant Alexander's daughter's DNA samples, the DNA samples from the two items were inadequate to match with anyone, including known individuals. Therefore, trial counsel's failure to submit the partial DNA profile to a larger database or to obtain DNA samples from Co-defendant Alexander or Co-defendant Alexander's daughter was not unreasonable, and he did not render deficient performance. Additionally, Petitioner has not shown any prejudice. The TBI lab report specifically states that the "partial DNA profile is not eligible for addition to the national database." Petitioner did not present any further proof at the post-conviction hearing about any other larger or global DNA databases that would have yielded any different results. Also, the fact remains that Petitioner was the major contributor to the DNA found on the black glove and ski mask. Petitioner is not entitled to relief.

### C. Failure to Challenge the Chain of Custody of the DNA Evidence

Petitioner argues that trial counsel was ineffective for failing to "question" the "chain of custody dilemma" because Detective Ferguson placed the black glove and ski mask into a paper bag, but Detective Jackie Heard was the one who actually sealed it.

Concerning this issue, the post-conviction court found:

The Petitioner argues that there was a chain of custody issue with regards to the evidence sent to the TBI lab as Officer Jackie Heard packaged the evidence, but it was Officer Zac[h] Ferguson who sent it off to the TBI lab. Jackie Heard did not testify as to the chain of custody and authenticity of the chain. Petitioner's argument misstates Tennessee law, as all links in the chain of custody not need to be proven, so long as the evidence presented establishes that the evidence is credible. Clearly, the jury concluded that the chain was sufficient and, thus, this issue is without merit.

The record does not preponderate against the post-conviction court's findings. At trial, Detective Ferguson testified that he collected the evidence, placed it in a paper bag, and sent it to the TBI lab for testing. He said that the bag had his name and the date on it, and "[w]e tape it up and initial on the seams." Detective Ferguson agreed that the back of

the bag contained his initials as the person who sealed the evidence. However, he pointed out that Detective "Jackie Heard is actually - - was one of the investigators assisting me. He actually sealed the bag." At the post-conviction hearing, trial counsel testified that he did not recall having a "serious concern about the chain of custody" based on this information.

We conclude that trial counsel did not render deficient performance by failing to object to the chain of custody concerning the black glove and ski mask. Petitioner failed to introduce any evidence at the post-conviction hearing to demonstrate that even if trial counsel had challenged the chain of custody as to those items, such a challenge would have been successful. Accordingly, Petitioner has failed to establish either deficient performance or prejudice resulting from any alleged deficiency in trial counsel's performance. Petitioner is not entitled to relief on this claim.

### D. Failure to Submit Certified Copies of Co-defendant Alexander's Prior Convictions for Impeachment Purposes

Finally, Petitioner contends that trial counsel was ineffective for failing to "run a criminal background check and obtain [c]ertified [c]opies of all of [Co-defendant] Alexander's prior convictions for [a]rmed [r]obbery and exposing these heinous crimes of moral turpitude to the jury" because the "very crime on trial is the one that the [S]tate's star witness 'The Co-Defendant' has on his record[, and it] is important to let the jury see [c]ertified copies of these convictions in writing and trial counsel admitted as much at the [p]ost[-][c]onviction [r]elief [h]earing."

Concerning this claim, the post-conviction court found:

As to [trial counsel] not introducing certified copies of [Co-defendant] Alexander's prior convictions for robbery and other violent crimes to impeach [Co-defendant] Alexander, a review of the record indicates that [Co-defendant] Alexander underwent thorough cross-examination by [trial counsel] and that [Co-defendant] Alexander's prior convictions were admitted under testimony. The information regarding [Co-defendant] Alexander's prior convictions were discussed and thoroughly questioned by [trial counsel] and, although the printed copies of the convictions were not submitted to the [c]ourt for proof, proof of his prior convictions was put into evidence through [Co-defendant] Alexander's testimony. Thus, there is no merit to the claim of ineffective assistance of counsel here.

Again, the record does not preponderate against the post-conviction court's findings. At the post-conviction hearing, trial counsel testified that he was aware through discovery that Co-defendant Alexander was going to testify at trial. He was aware of Co-defendant Alexander's criminal record and cross-examined him at trial about his prior

- 15 -

convictions that included armed robbery. While trial counsel did not recall if he obtained certified copies of the convictions, Co-defendant Alexander admitted to the convictions at trial. When asked if having certified copies of the convictions would have helped to "cast doubt" on Petitioner's involvement in the robbery, trial counsel replied: "It would have impeached him. Like I said, I impeached him through his own admission. So I guess the question is would it have impeached him more, made it more apparent to the jury. I mean possibly." However, trial counsel reiterated that Co-defendant Alexander's convictions "were in evidence already."

We conclude that trial counsel has not rendered deficient performance as to this claim. Co-defendant Alexander admitted at trial that he had an "extensive criminal record beginning when he was a juvenile," that included an armed robbery conviction in 1978. He further admitted that he had been "incarcerated on three separate occasions from the 1970s to the 1990s[,]" and he "pled guilty to vehicle theft around 2010." *Judkins*, 2019 WL 3889733, at \*3. Co-defendant Alexander further admitted that he had been indicted as an accomplice for the robbery in this case. *Id.* at \*4. Moreover, as pointed out by the State, the trial transcript reflects that trial counsel told Co-defendant Alexander that he had a "half-inch stack of [Co-defendant Alexander's] criminal record" with him at trial. Trial counsel further indicated that he would have introduced the certified copies had Co-defendant Alexander disputed them.

We conclude that trial counsel's decision not to introduce the certified copies of Co-defendant Alexander's convictions, since he admitted to them during cross-examination, was a strategic one that was made with adequate information as a result of trial preparation and will not be second-guessed by this court. *Hellard v. State*, 629 S.W.2d 4, 12 (Tenn. 1982); *Tolliver v. State*, 629 S.W.2d 913, 914 (Tenn. Crim. App. 1981). Trial counsel's performance concerning this issue was not deficient nor has Petitioner shown that he was prejudiced by counsel's performance. Petitioner presented absolutely nothing at the post-conviction hearing, including copies of the certified convictions or any other circumstances surrounding these convictions, that should have been presented to the jury or that would have affected the outcome of his trial. Petitioner is not entitled to relief on this claim.

### Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JILL BARTEE AYERS, JUDGE